**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **DONNA TRULL KAY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No.  3:16-CV-951-M-BH |
| | § | |
| **NANCY A. BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order No. 3-251*, this social security appeal was automatically referred for full case management. Before the Court are *Plaintiff's Memorandum - Social Security*, filed August 18, 2016 (doc. 20), and *Commissioner's Brief*, filed September 16, 2016 (doc. 22). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

## I. BACKGROUND[1]

### A.    Procedural History

Donna Trull Kay (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act). (R. at 1-9.) On March 6, 2013, Plaintiff filed her application for DIB, alleging disability beginning on January 20, 2011. (R. at 153-54.) Her claim was denied

---

[1]    The background information is summarized from the record of the administrative proceeding, which is designated as "R."

[2]    At the time of filing of this appeal, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration, but she was succeeded by Nancy A. Berryhill beginning January 20, 2017.

initially and upon reconsideration. (R. at 93-96, 99-102.) Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing on July 31, 2015. (R. at 37-50.) On September 15, 2015, the ALJ issued a decision finding Plaintiff not disabled and denying her claim for benefits. (R. at 15-36.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council. (R. at 13.) The Appeals Council denied her request for review on February 17, 2016, making the ALJ's decision the final decision of the Commissioner. (R. at 1-7.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## B. Factual History

### 1. Age, Education, and Work Experience

Plaintiff was born on February 24, 1951, and was 64 years old at the time of the hearing before the ALJ. (R. at 39.) She graduated from high school and communicated in English fluently. (R. at 30-31, 40.) She had past relevant work as an apartment housekeeper and an assistant apartment manager. (R. at 40, 46.)

### 2. Medical Evidence

On September 16, 2010, Plaintiff was admitted into Concentra Medical Center Urgent Care (Concentra) for an injury to her left hip while stepping off of a ladder at work the previous day. (R. at 344-46.) She reported pain while walking and bending and did "not feel able to resume normal activities at work." (R. at 344.) During the examination, Plaintiff had an unspecified decreased range of motion in her lumbar but had "5/5" motor strength with a normal gait and fine motor skills. (R. at 345.) She was diagnosed with lumbar and sacrolillac strain and referred to physical therapy for treatment. (*Id.*)

Between September 22, 2010 and September 28, 2010, Plaintiff completed three physical therapy sessions at Concentra. (R. at 347-56.) Her chief complaint was pain in her lower back when bending forward, which she rated as a "7/10." (R. at 347.) The initial assessment was a limited range of motion in her lumbar due to pain on her left side and a "slow and guarded" gait due to the pain. (R. at 348.) By her third and final therapy session, Plaintiff reported significant improvement with "0/10" back pain, and that her "hip pain was much better." (R. at 354.) She was discharged from physical therapy with a normal range of motion in her lumbar with some limits due to pain in the end range. (R. at 355.)

On October 13, 2010, Plaintiff returned to Concentra for "sharp pain across her low back" after twisting it. (R. at 358.) She received X-rays that showed some degenerative changes in her lumbar spine, but no fractures. (*Id.*) She was diagnosed with lumbosacral strain and was instructed not to climb stairs, squat, or kneel. (R. at 359.) She was also instructed on a home exercise program to help the strain and pain. (R. at 359.) At a follow-up visit at Concentra on October 20, 2010, Plaintiff reported that she was "ready to resume normal activities at work" and be released from care. (R. at 360.) During her musculoskeletal exam, it was noted that her hip exams were normal and that she had a full range of motion without pain. (*Id.*) She also exhibited "5/5" motor strength and a normal gait and fine motion. (*Id.*)

On April 22, 2011, Plaintiff visited Ashton Podiatry for pain in her right foot after she had "caught her foot on a threshold." (R. at 377.) Her X-rays did not show any fracture or dislocation, and she was diagnosed with "acute tibial sesamoiditis" and "pain in limb." (*Id.*) It was recommended that she purchase a "higher quality shoe [that was] fabricated [to] be more shock absorbing." (R. at 378.) She had four follow-up visits at Ashton Podiatry over the next two months.

(R. at 379-80.) She received an "interspace injection" and was fitted with an orthotic device for her shoe. (R. at 379.) At her final appointment on July 12, 2011, Plaintiff showed "minimal pain with mobilization" and no swelling, but did have signs of "degenerative arthritic changes." (R. at 380.)

Between September 29, 2009, and December 20, 2013, Plaintiff regularly met with Dr. Tom Morrill, D.O., as her primary care physician. (R. at 275-300.) She had primarily visited with Dr. Morrill for help with her diabetes, allergies, and sinus congestion, (R. 281-84, 289-90, 293-300), but she also met with him about her pain management and anxiety (R. at 275-80, 285-88, 291-92).

On May 7, 2013, Dr. Morrill completed a "Medical Opinion Questionnaire (Mental Impairments)." (R. at 321-24.) He rated Plaintiff as either "good" or "fair" in all activities of "mental abilities to do any job," except he rated her as "poor or none" on the following activities: travel in unfamiliar places; use public transportation; perform at a consistent pace without unreasonable number and length of rest periods; deal with normal work stress; and deal with stress of semiskilled and skilled work. (R. at 322-24.) Plaintiff would be absent from work more than twice a month. (R. at 324.)

On January 28, 2012, Plaintiff met with Dr. Mahmood Panjwani, M.D., P.A, for a consultative examination on her complaints of chronic pain in her right foot, chronic pain in her right shoulder, and left hip pain. (R. at 253-60.) During the physical examination, Dr. Panjwani noted that Plaintiff was awake, alert, oriented, was in no acute distress, and was able to get on and off the examining table without any assistive device and "without much difficulty." (R. at 255.) He also noted that she had a normal range of motion in all of her joints "with some discomfort in her left hip and right shoulder," but she had trouble squatting due to self-reported pain. (R. at 257, 260.) Her motor strength and hand grip were ranked "5/5" with a normal ability for fine finger movements.

(R. at 257.) An X-ray of her hip showed "mild degenerative changes in both hips, no greater on the left than the right," but it showed no evidence of fracture. (R. at 259.) She did not report or appear to have any problems with her vision, hearing, speech, or fine finger skills. (R. at 257-58.) Dr. Panjwani's impressions were that her right foot "appear[ed] to . . . have some soft tissue contusion" and her right shoulder and left hip had a normal range of motion. (R. at 257.)

On February 25, 2012, Plaintiff was admitted into the Baylor Medical Center at Garland for pain in her chest and ribs. (R. at 263-69.) She reported a pain level of "10/10" in her left side and chest when she moved or changed positions. (R. at 267.) During the physical exam, she appeared alert and in "no acute distress" with no tenderness in her extremities, but she showed pain in her left arm movement. (R. at 268.) The X-ray of her chest was normal except for a "10 mm nodule right mid lung field [that had] indeterminate clinical significance." (R. at 263.)

On January 7, 2014, Plaintiff met with Dr. Rakiya Diallo, M.D., for a consultative internal medicine examination. (R. at 302-11.) Plaintiff identified problems with her right foot, hips, right shoulder, and right eye. (R. at 302.) During the physical exam, Dr. Diallo identified no abnormalities but noted some limits to the range of motion in her right shoulder and left hip. (R. at 306-09.) An X-ray of Plaintiff's right foot showed signs of "osteopenia" but no signs of fracture, dislocation, or "bony destruction." (R. at 310.)

On February 4, 2014, Plaintiff met with Dr. Sanaz Adibian, Psy.D., of Galaxy Counseling Center for a mental status consultative examination to assess her complaints of anxiety and depression. (R. at 314-20.) During the interview, Plaintiff reported that she had feelings of depression and anxiety that began after she lost her job, which caused her to cry and feel guilty often. (R. at 315.) She also reported that she did not like to leave the house or be in the presence of

others, but she spent her days "crocheting a blanket and playing on her phone" until going to bed. (*Id.*) Dr. Adibian noted that Plaintiff required assistance for getting dressed and cooking but could manage her finances by herself. (*Id.*) He also noted that Plaintiff showed "clear and coherent" thinking with normal psychomotor activity, no confusion or disorganization, an intelligence in the "average range of functioning," and a "sad affect." (R. at 317.) Her short term and long term memories were intact, but her concentration and attention were "mildly impaired" where she would "give up way too easily." (*Id.*) Dr. Adibian gave Plaintiff a "fair" prognosis with signs of "moderate impairment in ability to work and moderate impairments in mood, judgment, and thinking." (R. at 318.) He opined that Plaintiff could "understand, carry out, and remember one or two step instructions," had appropriate social interactions, and had difficulties remembering and acting on complex instructions and normal work environment pressures. (*Id.*)

On March 5, 2014, Dr. Blaine Carr, Ph.D., a state agency medical consultant (SAMC) reviewed Plaintiff's medical evidence on record and submitted a Mental Residual Functional Capacity Assessment. (R. at 72-73.) He opined that Plaintiff was "moderately limited" in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and the ability to accept instructions and respond appropriately to criticism from supervisors. (*Id.*) Overall, Plaintiff was able to make decisions, accept instructions, respond appropriately to changes in routine, and to understand, remember, and carry out detailed but not complex instructions. (R. at 73.)

On May 8, 2014, Dr. Susan Posey, Psy.D., a SAMC also filled out a Mental Residual

Functional Capacity Assessment for Plaintiff based upon the evidence on record. (R. at 85-86.) She agreed with Dr. Carr's assessment of four "moderately limited" abilities his ultimate findings on Plaintiff's mental limitations. (R. at 86.)

On July 29, 2015, Dr. Morrill completed a "Medical Opinion Questionnaire: Physical Activities" on behalf of Plaintiff. (R. at 389-94.) He opined that Plaintiff could not walk a single city block without rest and could continuously sit for only 30 minutes and stand for only 45 minutes. (R. at 389.) She could sit, stand, or walk for less than 2 hours in a normal 8 hour workday and would have to take "4-5" unscheduled breaks. (R. at 389-90.) Dr. Morrill found significant limitations in reaching, handling, or fingering, and that she could use her hands, fingers, and arms for only 20% of each day. (R. at 390.) In response to the question asking for the number of expected work absences due to health reasons, he just wrote, "cannot work." (R. at 391.)

Also on July 29, 2015, Dr. Morrill completed another "Medical Opinion Questionnaire (Mental Impairments)." (R. at 392-94.) Compared to the 2013 questionnaire, the 2015 questionnaire reflected an increase in Plaintiff's ability to perform 7 of the 25 categories of the "mental abilities and aptitude needed to do any job." (R. at 321-24.) This included increases in 3 categories in which her ability had been classified in 2013 as "poor or none," including the ability perform at a consistent pace without an unreasonable number and length of rest periods, deal with normal work stress, and deal with stress of semiskilled and skilled work. (R. at 392-93.) Dr. Morrill also opined on this form that Plaintiff "cannot work." (R. at 394.)

### 3.    Hearing Testimony

On July 31, 2015, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 37-50.) Plaintiff was represented by an attorney. (R. at 39.)

### a.    Plaintiff's Testimony

Plaintiff testified that she was 64 years old, stood 5'2" tall, and weighed 97.2 pounds. (R. at 39.) She had been divorced and could drive "a little." (R. at 40.) She had graduated from high school, and her last job had been as a housekeeper for an apartment complex for 17 years. (*Id.*) She had been fired from that position in January 2011 because a "new management company came in and took over the company." (R. at 41.)

Plaintiff had pain in her hips after two accidents on the property where she previously worked. (R. at 41-42.) If she "turn[ed] or twist[ed] too fast," it would pull her hip out of place. (R. at 42.) Her doctors never suggested a hip replacement or injections but only prescribed therapy. (*Id.*) She also had complications with her diabetes that caused "burning [and] shooting" leg pain that could come and go. (R. at 43.) She could stand only for less than 30 minutes at a time and rarely left her house because of the pain. (R. at 44.) She could get in and out of bed with the help of a "little stool" and could cook basic things, such as cereal and coffee. (R. at 44.) She could do "not much" housework, but she "might be all right" to sweep her house so long as she did not "twist just the wrong way." (R. at 45.) She could only sleep for four hours a night on average but would "nap every day" in the afternoon. (R. at 45-46.)

Plaintiff also testified that she had issues with anxiety and took Valium that "sometimes" helped. (R. at 41-42.) She did not like being around groups of people but had previously worked around "different crews" and maintenance workers on a daily basis. (R. at 42.)

### b.    VE's Testimony

The VE testified that he had reviewed Plaintiff's work history and determined that she had the following past relevant work: apartment housekeeper, DOT 381.687-018 (medium, unskilled,

SVP: 2) and assistant apartment manager, DOT 185.167-046 (light, skilled, SVP: 7). (R. at 46.)

The ALJ asked the VE to consider a hypothetical person with the same age and education as Plaintiff and the following limitations: no exertional limitations but needed to avoid crawling, ropes, scaffolds, and climbing ladders; only occasionally able to perform all other postural limitations; able to understand, carry out, and remember detailed instructions and tasks; able to ask for help; able to maintain attention for a two-hour period of time; and required occasional coworker-supervisory interaction with only occasional public contact. (R. at 47.) The VE testified that this hypothetical individual could perform Plaintiff's past relevant work of apartment housekeeper, but the apartment manager position would be excluded. (R. at 47-48.)

The ALJ then asked the VE if that hypothetical person could perform any other work in the national and regional economy. (R. at 48.) The VE responded that this hypothetical person could perform the following jobs: laundry worker, DOT 361.684-014 (medium, unskilled) with 186,000 jobs in the national economy and 18,600 in Texas; dry cleaner helper, DOT 362-686-010 (medium, unskilled) with 135,000 jobs nationally and 13,500 in Texas; and hand packager, DOT 920.587-018 (medium, unskilled) with 628,000 jobs nationally and 62,800 in Texas. (*Id.*)

## C.    ALJ's Findings

The ALJ issued his decision denying benefits on September 15, 2015. (R. at 15-36.) At step one,[3] he determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 20, 2011. (R. at 20.) At step two, the ALJ found that the medical evidence established that Plaintiff had a severe combination of the following impairments: hip degenerative joint disease; diabetes mellitus; hypertension; anxiety; and depression. (R. at 20-22.) At step three,

---

[3] The five-step analysis used to determine whether a claimant is disabled under the Social Security Act is described more specifically below.

the ALJ concluded that Plaintiff's severe impairments or combination of impairments did not meet or equal the requirements for presumptive disability under the listed impairments in 20 C.F.R. Part 404. (R. at 22.)

The ALJ then determined that Plaintiff retained the residual functional capacity (RFC) to perform the full range of work at all exertional levels with the following limitations: she must avoid crawling, climbing, using ropes, scaffolds, and ladders; she was limited to performing all other postural activities only occasionally; she could maintain attention for a two-hour period of time, could ask questions or could ask for help; could understand, remember, and carry out detailed tasks and instructions; was limited to only occasional public contact; and required occasional coworker or supervisory interaction. (R. at 25.)

At step four, the ALJ determined that Plaintiff could return to her past relevant work experience as an apartment housekeeper. (R. at 30.) At step five, the ALJ relied upon the VE's testimony to find that Plaintiff was also capable of performing work that existed in significant numbers in the national economy, including jobs such as laundry worker, dry cleaner helper, and hand packager. (R. at 31.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from the alleged onset of disability date of January 20, 2011, through the date of his decision. (R. at 32.)

## II. LEGAL STANDARD

Judicial review of the commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is defined as more than a

scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant

is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4.      If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Froga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

# III. ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1.   SSA's examining expert found, after a clinical interview, mental status exam, and his review of records, that [Plaintiff] should be limited to 1-2 step tasks; despite assigning this opinion "significant weight," the ALJ did not include these limitations in his RFC and did not provide any reason for rejecting them,

    A.   Dr. Adibian, the Agency's examining psychologist's opinion.
    B.   The ALJ erred when he did not include all of the limitations set forth in SSA's expert's assessment, and did not explain why he excluded certain limitations.
    C.   Harm: [Plaintiff's] past work, which the ALJ relied on to deny her at Step 4, and the alternative Step 5 jobs all require more than 1-2 steps; which is incompatible with the Agency's examiner's opinion.

2.   The ALJ's analysis of treating source evidence describing greater limitations than are accounted for in the RFC is contrary to the requirements of 20 C.F.R. § 404.1527 and Fifth Circuit precedent.

    A.   The three opinions of Plaintiff's treating physician, Dr. Morrill.
    B.   Evidence supporting Dr. Morrill's opinion with respect to Plaintiff's mental impairments.
    C.   Evidence supporting Dr. Morrill's opinion with respect to Plaintiff's physical impairments.
    D.   The ALJ did not give "good reasons" to reject the opinion of Plaintiff's treating physician in light of no other contradictory treating or examining source opinions.

(doc. 20 at 3.)

## A.   RFC Determination

Plaintiff argues that the ALJ erred by failing to include in the RFC all the mental limitations set forth by Dr. Adibian without explaining the exclusion. (doc. 20 at 6-11.)

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir.1985).  The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no

allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96–8p, 1996 WL 374184 at *1. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence[.]" *See Johnson*, 864 F.2d at 343 (citations omitted).

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1520b(b) & 404.1527(c). Every medical opinion is evaluated regardless of its source. *Id.* at § 404.1527(c)(1). Generally, an opinion from an examining source is given more weight than the opinion from a non-examining source. *Id.* However, the "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560 (5th

Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). The ALJ is also free to reject the medical opinion of any physician when the evidence supports a contrary conclusion. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981). Moreover, "[w]hen a treating or examining physician's opinions are inconsistent with other substantial evidence in the record, the opinions are not entitled to any specific weight in the ALJ's decision." *Smith v. Comm'r of Soc. Security Admin*, No. 4:12-CV-00625-DDB, 2014 WL 4467880 at*3 (E.D. Tex. Sept. 9, 2014).

Here, Dr. Adibian noted that Plaintiff self-reported feelings of depression and anxiety that began shortly after she lost her job. (R. at 315.) She showed "clear and coherent" thinking with normal psychomotor activity, but she had a sad affect. (R. at 317.) Plaintiff was not confused or disorganized and had an intelligence in the "average range of functioning," but he opined that her concentration and attention were "mildly impaired" and she would "give up way too easily." (R. at 317-18.) Dr. Adibian gave Plaintiff an overall "fair" prognosis with signs of "moderate impairment in ability to work and moderate impairments in mood, judgment, and thinking." (R. at 318.) He opined that Plaintiff could "understand, carry out, and remember one or two step instructions," had appropriate social interactions, and had difficulties remembering and acting on complex instructions and normal work environment pressures. (*Id.*)

The ALJ's decision presented an overview of Dr. Adibian's records of his meeting with Plaintiff, including notes that Plaintiff had a coherent thought process, normal psychomotor activity, no confusion, depressed mood, oriented, fair fund of knowledge, average intellectual functioning, an intact memory, and "only mildly impaired" concentration and attention. (R. at 21-22.) The ALJ explicitly determined that "[t]hese findings support the residual functional capacity in that [Plaintiff's] depression and anxiety limit [her] to detailed tasks and limited social interaction." (R.

at 22.) The ALJ also analyzed Dr. Adibian's findings that Plaintiff could understand, carry out, and remember one or two step instructions, had appropriate social interactions, had difficulty remembering and acting on complex instruction, and had difficulty dealing with normal pressures of the work environment. (R. at 27-28.) He gave the opinion "great weight" because it was consistent with the findings of other physicians as to Plaintiff's behavior, normal speech, normal thought content, average intellectual functioning, and an intact memory. (R. at 28.) In his RFC analysis, the ALJ determined that Plaintiff had the following mental limitations: could maintain attention for only a two-hour period of time; could ask questions or for help; could understand, remember, and carry out detailed but not complex tasks and instructions; was limited to only occasional public contact; and required occasional coworker or supervisory interaction. (R. at 25.)

Plaintiff argues that the ALJ erred when he excluded without explanation Dr. Adibian's opinion on Plaintiff's limitation to one-two step tasks and her difficulty coping with stress and normal work pressures. (doc. 20 at 10.) The ALJ clearly and explicitly analyzed Dr. Adibian's medical opinion and explained how these findings were included in Plaintiff's RFC, however. Read in full, the decision detailed Dr. Adibian's findings and opinions and then explained how "[Dr. Adibian's] findings support the residual functional capacity in that [Plaintiff's] depression and anxiety limit [Plaintiff] to detailed tasks and limited social interaction." (R. at 22.) This explanation sets forth with sufficient clarity how Dr. Adibian's findings were integrated into Plaintiff's RFC, namely that they were adopted into Plaintiff's mental limitations of being able to "understand, remember, and carry out detailed tasks and instructions" and being "limited to occasional public contact." (R. at 25.)

By not including some of Dr. Adibian's opined limitations in Plaintiff's RFC and explaining

how his findings instead "support . . . [a] limit to detailed tasks and limited social interaction," the ALJ properly rejected Dr. Adibian's opined limitation to "one-two step" tasks. *See Meyer v. Barnhart*, 163 F. App'x 347, 347-48 (5th Cir. 2006) (finding no error when the ALJ gave "significant weight" to a clinical examiner's medical opinion and then appeared to have "implicitly rejected [that examiner's] opinion that [the plaintiff] need[ed] the opportunity to change positions at will"); *see also Grant v. Colvin*, No. 3:13-CV-2303-B, 2014 WL 4626305, at *2 (N.D. Tex. Sept. 16, 2014) (finding no error when the ALJ "implicitly rejected [a consultative examiner's] opinions and determined that [the plaintiff] had the RFC for the full range of medium work"). The medical record provides substantial evidence to support the ALJ's findings on Plaintiff's mental limitations, including the SAMC mental assessments from Drs. Carr and Posey, as well as the assessment notes from Galaxy Counseling Center. (R. at 72-73, 85-86, 314-20.)

The ALJ did not err by failing to include all the mental limitations as assessed by Dr. Adibian, and there is substantial evidence to support his exclusion. As the trier of fact, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available and the record as a whole. A reviewing court must therefore defer to the ALJ's decisions. *See Leggett*, 67 F.3d at 564. To the extent that Plaintiff complains of the failure to include mental limitations from Dr. Adibian in the RFC, the ALJ did not err, and remand is not required on this issue.

**B.** **Treating Source Opinions**

Plaintiff also argues that the ALJ erred by rejecting Dr. Morrill's treating source opinions on her physical and mental limitations. (doc. 20 at 18-22.)

As noted, the Commissioner is entrusted to make determinations regarding disability,

including weighing inconsistent evidence. 20 C.F.R. §§ 404.1520b(b) & 404.1527(c). Although every medical opinion is evaluated regardless of its source, the Commissioner generally gives greater weight to opinions from a treating source. *Id*. at § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* at § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id*. at § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* at § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id*. A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id*. at 455–56. Nevertheless, "absent reliable medical

18

evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, Dr. Morrill, who is identified as Plaintiff's primary care physician and a treating source, submitted medical records from between September 29, 2009, and December 20, 2013, as well as medical source statements in the form of questionnaires for both Plaintiff's mental and physical limitations. (R. at 275-300, 321-24, 389-94.)

### 1. *Mental Limitations*

In 2013, Dr. Morrill completed a questionnaire regarding Plaintiff's mental limitations. (R. at 321-24.) He left blank all of the questions requiring a written answer, including the explanation of the treating relationship, diagnoses, and prognosis, and just filled in the check-mark boxes on her "mental abilities to do any job." (R. at 322-24.) Plaintiff ranked as "good" or "fair" in 20 of the 25 activities and as "poor or none" on the remaining 5 activities, including travel in unfamiliar places; use of public transportation; perform at a consistent pace without unreasonable number and length of rest periods; deal with normal work stress; and deal with stress of semiskilled and skilled work. (R. at 322-24.) She would be absent from work more than twice a month. (R. at 324.)

Two years later, in the exact same questionnaire, Dr. Morrill did answer the questions and

explained that he was Plaintiff's family practitioner, had first seen her on July 25, 2005, had diagnosed her with anxiety and back pain, and had provided a fair prognosis. (R. at 392.) He amended several of his responses to increase her ability to perform 7 of the 25 "mental abilities and aptitude needed to do any job." Her ability to perform in 3 of those categories had originally been classified as "poor or none," including the ability to perform at a consistent pace without an unreasonable number and length of rest periods, deal with normal work stress, and deal with stress with semiskilled and skilled work. (R. at 392-93.) Though he noted that her mental ability increased in many of the mental job activities, he opined that Plaintiff "cannot work" without further explanation. (R. at 394.)

The ALJ's decision specifically identified Dr. Morrill's opinions that Plaintiff had a poor ability to travel in unfamiliar places; use public transportation; perform at a consistent pace without unreasonable number and length of rest periods; deal with normal work stress; and deal with stress of semiskilled and skilled work. (R. at 28.) It noted that even though this was a treating source opinion, it could "be assigned little or no weight when good cause is shown." (R. at 28.) He ultimately gave Dr. Morrill's opinion "partial weight" because it was "inconsistent with the medical record," and his conclusions were "not supported by [his own] medical record." (R. at 28.) He cited to the inconsistent opinions from examining physicians Drs. Diallo and Adibian. (R. at 28.)

Plaintiff argues that the ALJ erred by failing to analyze Dr. Morrill's treating source opinion on her mental limitations under all of the factors identified in § 404.1527. (doc. 20 at 18-21.) The ALJ was not required to perform a full factor-by-factor analysis of this treating source opinion because there was "competing first-hand medical evidence" from examining sources that the ALJ instead relied upon. *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (quoting

*Newton*, 209 F.3d at 458). Contrary to Plaintiff's assertion that there was "no opinion contrary to Dr. Morrill's," the ALJ points out that Dr. Morrill's findings were inconsistent with the examining opinions of Drs. Diallo and Adibian, who stated that Plaintiff had a fair fund of knowledge, average intellectual functioning, an intact memory, was able to perform detailed tasks, and remember detailed instructions. (R. at 28, 302-11, 314-20.) Dr. Morrill's medical records, moreover, included only general references to Plaintiff's "anxiety" and how she requested "something for nerves," but the records do not include any testing or examination that was consistent with the opined mental limitations and conclusion that she could not work because of them. (R. at 276, 279-80, 287.) Because the ALJ relied on competing first-hand medical evidence, including Dr. Morrill's own treatment notes, and he found the opinions of the other examining physicians more well-founded, he was not required to perform a full factor-by-factor analysis when rejecting his opinion, and substantial evidence supports his decision. *See Newton*, 209 F.3d at 458. To the extent that Plaintiff complains of the failure to include medical opinions from Dr. Morrill on the mental limitations in Plaintiff's RFC, the ALJ did not err, and remand is not required on this issue.

### 2.    *Physical Limitations*

Dr. Morrill also completed a "Medical Opinion Questionnaire: Physical Activities," in which he found that Plaintiff could not walk a single city block without rest, and could continuously sit for only 30 minutes and stand for only 45 minutes. (R. at 389-94.) She could sit, stand, or walk for less than two hours in a normal 8 hour workday and would have to take "4-5" unscheduled breaks. (R. at 389-90.) Dr. Morrill further determined that Plaintiff had significant limitations in reaching, handling, or fingering, and that she could use her hands, fingers, and arms for only 20% of each day. (R. at 390.) On the question asking number of expected work absences due to health reasons, Dr.

Morrill only wrote in "cannot work." (R. at 391.)

In his decision, the ALJ specifically analyzed and assessed Dr. Morrill's opinions on Plaintiff's physical limitations. (R. at 28.) The ALJ determined that his treating source opinion deserved only "little weight" because of the many inconsistencies between these conclusions and the medical record, as well as the inconsistencies with Plaintiff's "limited treatment course and her activities of daily living." (R. at 28-29.) He cited to the inconsistent opinions from the examining physicians Drs. Panjwani, Diallo, and Adibian. (R. at 28-29.)

Plaintiff again argues that the ALJ erred by failing to analyze Dr. Morrill's treating source opinion on her physical limitations under all of the factors identified in § 404.1527. (doc. 20 at 18-21.) The ALJ was also not required to perform a full factor-by-factor analysis of this treating source opinion because there was "competing first-hand medical evidence" from examining sources that the ALJ instead relied upon. *See Walker*, 158 F. App'x at 535 (quoting *Newton*, 209 F.3d at 458). The ALJ's decision identified inconsistent examining opinions from Drs. Panjwani and Diallo, who noted that Plaintiff had full motor strength, a full hand grip, normal cerebellar functions, normal muscle tone, normal coordination, and a normal gait, as well as the inconsistent examining notes from Dr. Adibian identifying Plaintiff's daily activities of "crocheting a blanket, playing on her phone, dressing without assistance, and managing her finances independently." (R. at 28-29, 253-60, 302-11, 314-20.) Dr. Morrill's medical records only include cursory references to Plaintiff's neck, hip, and back pain and prescriptions for pain medication, but they do not provide any examination or assessment results to support the significant physical limitations that Dr. Morrill opined about on the questionnaire. (R. at 279-80, 285-86, 291-92.) Because the ALJ relied on competing first-hand medical evidence, including Dr. Morrill's own treatment notes, and he found the opinions of the

other examining physicians more well-founded, he was not required to perform a full factor-by-factor analysis when rejecting his opinion, and substantial evidence supports his decision. *See Newton*, 209 F.3d at 458. To the extent that Plaintiff complains of the failure to include medical opinions from Dr. Morrill on the physical limitations in Plaintiff's RFC, the ALJ did not err, and remand is not required on this issue.[4]

## IV. RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 28th day of August, 2017.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[4] Though not identified as a separate issue, Plaintiff also argued here that the ALJ had a duty to re-contact Dr. Morrill for additional information pursuant to *Newton*, "given that his opinion is un-contradicted by any treating or examining sources." (doc. 20 at 21.) Because he relied upon other medical opinion evidence from examining physicians in the determined RFC, the ALJ did not err by failing to seek additional information from Dr. Morrill, and remand is not required. *See Newton*, 209 F.3d at 453, 457 ("if the Commissioner determines that a treating physician's records are inconclusive or are otherwise inadequate to receive controlling weight, absent other medical opinion evidence by an examining or treating physician, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e)").

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE